United States District Court
Middle District of Florida
Jacksonville Division

TAYLOR CASEY ET AL.,

     *Plaintiffs,*

v.                                 No. 3:14-cv-1229-J-39PDB

FLORIDA COASTAL SCHOOL OF LAW, INC.,

     *Defendant.*

---

## Report & Recommendation on Motion to Dismiss

Complaining that Florida Coastal School of Law ("Florida Coastal") publicized deceptive and unfair employment and salary data, seven of its graduates sue under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201–213, seeking $100 million, equitable relief, and class-action status.[1] Doc. 74. Florida Coastal moves to dismiss the case "in its entirety and with prejudice" under Federal Rule of Civil Procedure 12(b)(6), arguing its compliance with American Bar Association ("ABA") standards activates FDUTPA's safe-harbor provision, the

---

[1]Six of the plaintiffs filed the original complaint in state court in February 2012 on behalf of themselves and a proposed class of all persons "who are either presently enrolled or graduated from Florida Coastal … within the statutory period." Doc. 1-1 ¶ 85. Florida Coastal removed the case to the United States District Court for the Southern District of Florida under the Class Action Fairness Act, 28 U.S.C. § 1332(d). Doc. 1. The plaintiffs moved to remand it, Doc. 6, and Florida Coastal moved to dismiss it, Doc. 5. That court denied the motion to remand, Doc. 45, denied the motion to dismiss without prejudice, Doc. 46, and transferred the case here, Doc. 46. Upon the parties' joint request, this Court stayed discovery and deferred issuance of a case management and scheduling order pending a decision on the motion to dismiss. Doc. 81. No party has moved for class certification yet.

plaintiffs insufficiently allege deception, causation, and actual damages, and the statute of limitations bars most of the claims. Doc. 76. The plaintiffs disagree. Doc. 83. The Court allowed them to amend their pleading before, Doc. 69, and they do not seek to do so again, *see generally* Doc. 83.

## I.    Overview

Although this case is the first and only of its kind in Florida, many cases against law schools for allegedly publishing deceptive and unfair employment and salary data have been brought elsewhere under various state tort and consumer-protection laws.[2] *See* Ogechi Achuko, *The Blame Game: Law Students Sue Their Law Schools for Deceptive Employment Reporting Practices*, 20 Va. J. Soc. Pol'y & L. 517 (2013). The plaintiffs in those cases have met with mixed success. *Compare MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654 (6th Cir. 2013) (affirming dismissal of Michigan claims because law inapplicable to purchase of education); *Phillips v. DePaul Univ.*, 19 N.E.3d 1019 (Ill. App. Ct. 2014) (affirming dismissal of Illinois claims because plaintiffs insufficiently alleged deceptive act or practice, causation, and actual damages); *Evans v. Ill. Inst. of Tech.*, No. 1-12-3611, 2014 WL 4803004 (Ill. App. Ct. Sept. 26, 2014) (unpublished) (same); *Gomez-Jimenez v. N.Y. Law Sch.*, 943 N.Y.S.2d 834 (N.Y. Sup. Ct. 2012) (dismissing New York claims because plaintiffs insufficiently alleged deceptive act and actual damages), *aff'd*, 103

---

[2] Graduates filed a FDUTPA class action against Barry University School of Law in Orlando but alleged a different deceptive or unfair act (failure to use promised best efforts to obtain accreditation). *See Cheatwood v. Barry Univ., Inc.*, No. C10M01-0003986, 2001 WL 1769914 (Fla. Cir. Ct. Dec. 26, 2001) (unpublished).

A.D.3d 13, 956 N.Y.S.2d 54 (N.Y. App. Div. 2012); *Austin v. Albany Law Sch. of Union Univ.*, 957 N.Y.S.2d 833 (N.Y. Sup. Ct. Jan. 3, 2013) (same); *Bevelacqua v. Brooklyn Law Sch.*, No. 500175/2012, 2013 WL 1761504 (N.Y. Sup. Ct. Apr. 22, 2013) (unpublished) (same); *with Harnish v. Widener Univ. Sch. of Law*, 931 F. Supp. 2d 641 (D.N.J. 2013) (denying dismissal of New Jersey and Delaware claims because plaintiffs alleged plausible unlawful conduct, ascertainable damages, and causation); *Hallock v. Univ. of S.F.*, No. CGC-12-517861 (Cal. Super. Ct., July 19, 2012) (unpublished) (overruling demurrer on California claims because plaintiffs alleged plausible deceptive act); *Alaburda v. Thomas Jefferson Sch. of Law*, No. 37-2011-00091898, 2012 WL 6039151 (Cal. Super. Ct. Tr. Div. Nov. 29, 2012) (unpublished) (denying summary judgment on California claims because plaintiff's reliance was reasonable and she sustained damages from attending school "that is not what it purported to be").

## II.  Alleged Facts[3]

InfiLaw Corporation, a fund owned by Sterling Partners, a private-equity firm, owns and operates three for-profit law schools, including Florida Coastal. Doc. 74 ¶¶ 1, 20. Founded in 1996 and accredited by the ABA in 2002, Florida Coastal is now one of the country's largest law schools, having grown dramatically since Sterling Partners acquired it. Doc. 74 ¶¶ 1, 21, 26. Enrollment increased from 449 first-year

---

[3]The plaintiffs say their allegations "are based on the investigation of counsel, including but not limited to reviews of advertising and marketing material, various publicly available information and interviews of former students, and are thus made on information and belief, except as to individual actions of Plaintiffs, as to which Plaintiffs have personal knowledge." Doc. 74 at 1.

students in 2005 to 722 first-year students in 2010. Doc. 74 ¶ 22. It now enrolls more than 1700 students. Doc. 74 ¶ 1.

Florida Coastal has some of the country's most relaxed admissions standards, admitting almost 70 percent of applicants and placing in the bottom 5 percent of accredited law schools based on grade point averages and LSAT scores. Doc. 74 ¶¶ 21–22. About a third of its students leave before their third year. Doc. 74 ¶ 23. Annual tuition increased by almost 50 percent between 2005 ($23,410) and now ($36,960). Doc. 74 ¶ 24. Almost all students take out loans and graduate with significant debt, recently averaging $120,000 to $150,000. Doc. 74 ¶ 25.

The ABA requires accredited law schools to "publish basic consumer information" in a "fair and accurate manner reflective of actual practice." Doc. 74 ¶ 26 (quoting Section 509(a) of the ABA's 2010–2011 Standards for Approval of Law Schools).[4] Florida Coastal "publishes its employment statistics on its website" under "Career Services." Doc. 74 ¶¶ 27, 28. There, Florida Coastal touts that its career-services department "enjoys a first-rate staff that stands ready to guide you along your own unique career path. We will assist you with all phases of your job search and professional development. From personalized career counseling to on-campus interviewing programs, our office will facilitate your transition from law school to legal practice. We pride ourselves in developing strong working relationships with

---

[4]The ABA's 2010–2011 Standards for Approval of Law Schools are available at http://www.americanbar.org/content/dam/aba/publications/misc/legal_education/Standards/standardsarchive/2010_2011_standards.authcheckdam.pdf.

our students that continue long after graduation." Doc. 74 ¶ 27.

Florida Coastal obtains the employment and salary data from surveys it sends to all recent graduates. Doc. 74 ¶ 28. The data therefore is "unaudited, unverified and self-reported." Doc. 74 ¶¶ 5, 28. Between 2008 and 2010, for class of 2007 graduates, Florida Coastal posted that 96.4 percent had obtained employment within nine months of graduation. Doc. 74 ¶ 28; *see also* Doc. 1-1 at 60. That number "rivals those of much higher ranked, top-tier schools, such as the University of Florida, which had a 95.9 percent placement rate" for its class of 2007 graduates. Doc. 74 ¶ 28. "Florida Coastal's employment data did not disclose the percentage of graduates who were employed in jobs that were not either temporary, part-time, voluntary, or JD required/JD preferred, and did not disclose the percentage of graduates who actually reported salary information." Doc. 74 ¶ 28.

"Upon information and belief, the school also posted the employment data and salary information for the classes of 2004, 2005, 2006, and 2009, reporting placement rates of 92 percent for the class of 2004, 91 percent for the class of 2005, 88 percent for the class of 2006, and 90 percent for the class of 2009." Doc. 74 ¶ 29. "Upon information and belief, for all … employment reports published before July 2011, Florida Coastal failed to disclose the overall percentage of graduates who reported salary information." Doc. 74 ¶ 41.

Beginning in July 2011, for class of 2010 graduates, Florida Coastal posted that 80 percent were employed nine months after graduation and included that 38 percent worked in private practice, 17 percent worked in "business," 10 percent

worked in government, 22.5 percent worked in public interest, 4 percent served in judicial clerkships, 3 percent worked in academia, 5 percent were seeking employment, 3 percent were unemployed and not seeking employment, and 4 percent were "unknown." Doc. 74 ¶¶ 5, 30. Florida Coastal posted that 82 percent of the employed graduates had jobs for which a J.D. was required or preferred. Doc. 74 ¶ 30. Florida Coastal "disclosed" a $48,615 average starting salary (including a $51,981 average salary for private practitioners), with 29 percent of employed graduates (23 percent of the entire class) providing salary data.[5] Doc. 74 ¶¶ 30, 41. Florida Coastal did not disclose "the exact percentages of graduates for each particular job category who reported salary information." Doc. 74 ¶ 41. The data appeared as follows, together with corresponding pie graphs:

### Coastal Law Class of 2010 Employment Data

Like all ABA accredited law schools, Florida Coastal School of Law is required to survey all members of its most recent graduating class to ascertain their employment status. Law schools report their employment data to the National Association for Law Placement (NALP) in February of each year. The data below reflect the employment status of our Class of 2010 graduates as of February 15, 2011.

**Employment Status:**

Our office was able to confirm the employment status of 401 of our 434 Class of 2010 graduates (92.4% of the class). The employment status of our 434 graduates is as follows:

- 346 (79.7%) are employed;
- 23 (5.3%) are enrolled in a full-time degree program;
- 14 (3.2%) are seeking work;
- 18 (4.2%) are unemployed and not currently seeking work; and
- 33 (7.6%) are unknown

---

[5]In a section of the complaint titled, "Preliminary Statement," the plaintiffs allege that "[o]nly 23 percent of the 2009 class reported any type of salary information." Doc. 74 ¶ 3. Considering their use of that same percentage for the class of 2010 elsewhere, Doc. 74 ¶¶ 5, 30, 41, and their allegation that "employment reports published before July 2011 … failed to disclose the overall percentage of graduates who reported salary information," Doc. 74 ¶ 41, the plaintiffs presumably mistakenly used "2009" instead of "2010" in the "Preliminary Statement."

**Type of Job:**

Our employed graduates have the following types of jobs:

- Bar Admission Required/Anticipated    59.9%
- JD Preferred (JD Enhances Position)    22.5%
- Professional Other    7.2%
- Non-Professional Other    6.4%
- Employed (Type Unknown)    4.0%

**Employer Type:**

Our employed graduates are working in the following areas:

- Private Practice:    38.4%
- Government:    10.4%
- Business/Industry:    17.1%
- Public Interest:    22.5%
- Judicial Clerkship:    4.1%
- Academia:    3.2%
- Unknown    4.3%

**Salary:**

The average starting salary for our Class of 2010 graduates was $48,615 (with 29% of employed graduates sharing their salary). The average salary for all graduates in private practice (regardless of firm size) was $51,981. According to the Florida Bar Association's *2010 Economics and Law Office Management Survey*, the average starting salary of a Florida attorney is $50,000.

We encourage you to contact the bar association in the other states that interest you and ask whether they publish a similar survey. You can visit http://www.abanet.org/barserv/stlobar.html to find contact information for bar associations throughout the country.

Doc. 1-1 at 56−58; Doc. 76-1 at 4−6.[6]

     Florida Coastal provided employment and salary data to three sources used by all accredited law schools and readily available to prospective students, the ABA, *U.S. News*, and the National Association for Law Placement ("NALP"). Doc. 74 ¶ 32. The ABA and *U.S. News* required only aggregate employment data. Doc. 74 ¶ 32. The NALP required data specific to the type of job obtained but published and otherwise made available only aggregate employment numbers. Doc. 74 ¶ 34. Based on data

_____

    [6]The plaintiffs attached the posting to their original complaint, Doc. 1-1 at 56−58; and Florida Coastal attached it to its motion to dismiss, Doc. 76-1 at 4−6.

Florida Coastal provided, the ABA and *U.S. News* reported the following percentages of graduates obtaining employment within nine months of graduation: 96 percent of class of 2003 graduates (*U.S. News*), 94 (ABA) and 92 (*U.S. News)* percent of class of 2004 graduates, 90 (ABA) and 91 (*U.S. News*) percent of class of 2005 graduates, 90 (ABA) and 88 (*U.S. News*) percent of class of 2006 graduates, 87 (ABA) and 96 (*U.S. News*) percent of class of 2007 graduates, 95 (ABA) and 95.4 (*U.S. News*) percent of class of 2008 graduates, and 91.4 (ABA) and 81.4 (*U.S. News*) percent of class of 2009 graduates.[7] Doc. 74 ¶ 33.

"Florida Coastal's reported employment placement rates and salary information barely dipped following the aftermath of the 'Great Recession,' as the … rates for the class of 2008 was an impressive 95 percent and 90 percent in 2009. With legal jobs becoming increasingly scarce, Florida Coastal continued to claim that the majority of its graduates are gainfully employed." Doc. 74 ¶ 5(b). "In reality, the employment data reported and marketed by Florida Coastal during the Class Period [an unspecified period to August 2012] bears little resemblance to the actual experiences and dim employment opportunities encountered by its graduates." Doc. 74 ¶ 36. Interviews of former students, a published study and article, other investigatory work by the plaintiffs' counsel, and an inference from the low percentage of graduates in the classes of 2010 and 2011 providing salary information, indicate that fewer than 30 to 40 percent "(if not even fewer)" of Florida Coastal graduates

---

[7]The plaintiffs do not allege facts that would explain why, for some years, the employment percentages in the ABA and *U.S. News* publications differed by up to 10 percentage points. *See generally* Doc. 74.

obtained full-time, permanent employment for which a J.D. was required or preferred within nine months of graduation. Doc. 74 ¶¶ 5, 36, 39. Most worked in part-time, temporary, or volunteer positions. Doc. 74 ¶ 36. Few earned salaries like the published average salaries. Doc. 74 ¶ 36.

The employment percentages were higher because Florida Coastal, like most or all law schools before August 2012, included part-time, non-legal, temporary, voluntary, school-funded, and solo-practitioner jobs began in desperation. Doc. 74 ¶¶ 26, 28, 37, 38. Florida Coastal also "included graduates who were employed at any point within nine months of the graduate survey, even if they were not employed as of the reporting date for the survey." Doc. 74 ¶ 37. Prospective students would not have been able to find the percentage of graduates who, within nine months of graduation, obtained and kept full-time, permanent employment for which a J.D. was required or preferred. Doc. 74 ¶ 4.

The salary averages were higher because Florida Coastal "calculated them based on a small, deliberately selected subset of compensated graduates who reported their salary information, and not on a broad, statistically meaningful representation of its graduates." Doc. 74 ¶ 40. It "inflates its graduates' reported mean/median salaries by calculating them based on a small subset of graduates who actually submit their salary information and are high earners." Doc. 74 ¶ 3. It "chose a few graduates in high-paying jobs to respond to its job survey while ignoring all other graduates." Doc. 74 ¶ 40. "This had the effect of ensuring that graduates with salaries in legal jobs were disproportionately overrepresented in its reported salary

information, and that underemployed or unemployed graduates were disproportionately underrepresented." Doc. 74 ¶ 40. "Florida Coastal[] tabulated, calculated, and tallied the raw data inputted in the job surveys filled out by recent graduates in a shoddy manner, and omitted or ignored critical statistical data that would substantially lower both placement rates and salary information." Doc. 74 ¶ 37.

The plaintiffs enrolled in Florida Coastal to secure full-time, permanent jobs for which a J.D. is required or preferred. Doc. 74 ¶ 59. Taylor Casey graduated in 2010. Doc. 74 ¶ 13. Although in the top 13 percent of his class, he could not secure "full-time, permanent legal employment." Doc. 74 ¶ 13. He therefore started his own firm after obtaining Florida Bar membership. Doc. 74 ¶ 13. He continues to operate the firm. Doc. 74 ¶ 13. Audra Awai graduated in 2008. Doc. 74 ¶ 14. Discouraged by "dim job prospects in the legal sector," she joined the United States Army without taking a bar examination. Doc. 74 ¶ 14. Clifford Klein graduated in 2010. Doc. 74 ¶ 15. He is a member of the Florida Bar and a practicing lawyer. Doc. 74 ¶ 15. Jocelyn Stinson graduated in 2011. Doc. 74 ¶ 16. She moved to Maryland. Doc. 74 ¶ 16. Melissa Shipman could not secure "full-time, permanent employment" following graduation (at an unspecified time from an unspecified place but presumably Florida Coastal). Doc. 74 ¶ 17. She therefore opened her own law firm. Doc. 74 ¶ 17. She is a member of the Tennessee and Florida Bars. Doc. 74 ¶ 17. Amy Kisz graduated in 2010. Doc. 74 ¶ 18. She likewise could not secure "full, permanent employment." Doc. 74 ¶ 18. She therefore "was compelled to accept part-time, temporary positions doing mostly document review." Doc. 74 ¶ 18. She is a member of the North Carolina and

Florida Bars and a practicing lawyer. Doc. 74 ¶ 18. Christopher Wickersham graduated in 2009. Doc. 74 ¶ 19. He was "initially unable to obtain any type of gainful legal employment." Doc. 74 ¶ 19. He therefore opened his own firm and operated it for several years. Doc. 74 ¶ 19. He is a member of the Florida Bar and a practicing lawyer. Doc. 74 ¶ 19.

After the plaintiffs enrolled at Florida Coastal, law schools received public criticism for reporting aggregate employment data. Doc. 74 ¶¶ 42–43. The criticism included correspondence from United States Senator Barbara Boxer to the ABA and the United States Department of Education "decrying the systemic lack of transparency in the reporting of employment data by law schools to prospective and current students," and from the *U.S. News* editor-in-chief to law school deans opining "'the entire law school sector is perceived to be less than candid' when reporting employment data." Doc. 74 ¶ 43. The ABA recently adopted standards requiring law schools to indicate whether jobs are full-time or part-time, permanent or temporary, law-school funded or not, and J.D. required or preferred. Doc. 74 ¶ 44.

Beginning in April 2012, for the class of 2011 graduates, Florida Coastal's website posted that 38.6 percent have full-time, J.D. required positions, 44.3 percent have full-time, J.D. required or preferred positions, and 124 graduates (27.5 percent of the class) reported salary data (including 33 percent of those in private practice, 34 percent of those in "business," 72 percent of those in government, and 17 percent of those in public interest). Doc. 74 ¶¶ 31, 41. The "changes come too late for [the plaintiffs] since they have already taken on tens of thousands of dollars in non-

dischargeable debt based on Florida Coastal's … statements." Doc. 74 ¶ 44.

## III. Claims

In a single count, the plaintiffs claim Florida Coastal's "actions constitute unlawful, unfair, deceptive and fraudulent practices" prohibited by FDUTPA. Doc. 74 ¶ 55. They assert, "As part of its fraudulent marketing practices and recruitment program, Florida Coastal engaged in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and fraudulently induce reliance by Plaintiffs and members of the Class." Doc. 74 ¶ 58. They continue, "These false representations and omissions were uniform and identical in nature, and include, without limitation, the following:

a) Stating false placement rates during the recruitment and retention process, including that approximately 80–95 percent of Florida Coastal graduates secured employment within nine months of graduation;

b) Manipulating post-graduate employment data, so as to give the appearance that the overwhelming majority of recent graduates secured full-time, permanent employment for which a JD degree is required or preferred;

c) Grossly inflating the reported mean/median salaries earned by recent graduates;

d) Disseminating false post-graduate employment data and salary information to various third-party data clearinghouses and publications, such as the ABA and *US News*;

e) Making deceptive and misleading statements, representations and omissions concerning the pace at which recent graduates could obtain gainful employment in their chosen field; and

f) Causing students to pay inflated tuition based on materially misleading statements, representations and omissions, including, specifically, that approximately 80–95 percent of Florida Coastal

graduates secure gainful employment.

Doc. 74 ¶ 58.

The plaintiffs demand preliminary and permanent injunctive relief (enjoining Florida Coastal from engaging in unfair, unlawful, or fraudulent practices), other equitable relief (requiring Florida Coastal to retain independent persons to audit and verify employment and salary data), certification of a class comprising all persons enrolled in Florida Coastal before August 2012 (with conflict-of-interest exceptions),[8] $100 million in restitution and disgorgement of tuition paid ("which is the difference between the inflated tuition paid by Class members based on the material misrepresentations that approximately 80−95 percent of graduates are employed within nine months of graduation and the true value of a Florida Coastal degree"), unspecified damages, punitive damages, an accounting of profits, attorney's fees and costs, pre-judgment interest, and any other relief the Court deems warranted. Doc. 74 at 6, 23−24.

## IV.  FDUTPA

FDUTPA makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). FDUTPA's provisions "shall be construed liberally" to "protect the consuming public and legitimate business enterprises from

---

[8]In the first line of the amended complaint, the plaintiffs state they are acting for themselves "and for all persons who currently attend or graduated from [Florida Coastal] during the relevant time period." Doc. 74 at 1. They clarify the class they seek to represent in the later class-action allegations. Doc. 74 ¶¶ 6, 45.

those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). Furthermore, in construing "[u]nfair methods of competition, unconscionable acts or practices, and deceptive or unfair acts or practices in the conduct of any trade or commerce," courts should give "due consideration and great weight" to interpretations by the Federal Trade Commission and federal courts construing section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). Fla. Stat. § 501.204(2).

An act or practice is deceptive if it "is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *State v. Beach Blvd. Automotive, Inc.*, 139 So. 3d 380, 387 (Fla. 1st DCA 2014). That standard requires a showing of "probable, not possible, deception that is likely to cause injury to a reasonable relying consumer." *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (internal quotation marks omitted). An act or practice is "unfair" if it causes consumer injury that is (1) substantial, (2) not outweighed by any countervailing benefits to consumers or competition, and (3) one that consumers themselves could not have reasonably avoided. *Porsche Cars N. Amer., Inc. v. Diamond*, 140 So. 3d 1090, 1096 (Fla. 3d DCA 2014).[9] An injury is reasonably

---

[9]Although courts applying FDUTPA have long defined an "unfair" act or practice as one that "offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," *see, e.g., PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (quoted), that definition is outdated, *Porsche*, 140 So. 3d at 1096. Regardless, my recommended conclusion does not depend on which definition is used.

avoidable if consumers "have reason to anticipate the impending harm and the means to avoid it." *Orkin Exterm. Co., Inc. v. FTC*, 849 F.2d 1354, 1365−66 (11th Cir. 1988).

Alleged acts or practices deemed sufficiently deceptive or unfair include installing GPS tracking devices on cars without consent and leading car buyers to believe they would get their deposits back if they did not buy the cars, *Beach Blvd. Auto.,* 139 So.3d at 390; refusing to return a deposit despite a promise to do so, *Wright v. Emory*, 41 So. 3d 290, 292−93 (Fla. 4th DCA 2010); identifying a home in a reservation form but later offering a home on an inferior lot at a higher price, *Fendrick v. RBF, L.L.C.,* 842 So. 2d 1076, 1079 (Fla. 4th DCA 2003); intentionally concealing from a car buyer he was entering into a lease agreement rather than a sales agreement, *Cummings v. Warren Henry Motors, Inc.*, 648 So.2d 1230, 1232 (Fla. Dist. Ct. App. 1995); and deliberately misleading a distributor into making sales and then using the sales as a pretext for terminating the distributor's contact, *Day v. Le-Jo Enter., Inc.* 521 So.2d 175, 178 (Fla. 3d DCA 1988).

Whether an alleged act or practice is deceptive or unfair may be decided as a matter of law. *See, e.g. P.C. Cellular, Inc. v. Sprint Solutions, Inc.*, No. 5:14-cv-237-RS-GRJ, 2015 WL 128070, at *5 (N.D. Fla. Jan. 8, 2015) (unpublished); *Zambrano v. Indian Creek Holding, LLC*, No. 09-20453-CIV, 2009 WL 2365842, at *1 (S.D. Fla. July 30, 2009) (unpublished); *Brett v. Toyota Motor Sales, U.S.A., Inc.*, No. 6:08-cv-1168-Orl-28GJK, 2008 WL 4329876, at *7 (M.D. Fla. Sept. 15, 2008) (unpublished); *but see Herrera v. JFK Med. Ctr. Ltd. P'ship.*, No. 8:14-cv-2327-T-30TBM, 2015 WL 730039, at *3 (M.D. Fla. Feb. 20, 2015) (to be published) (expressing "serious doubts"

whether alleged practice "rises to the level of unfairness and deception as contemplated" by FDUTPA but allowing plaintiffs to proceed, along with other claims, with statement that court would "revisit this issue at summary judgment").

Exempted from FDUTPA liability is any "act or practice required or specifically permitted by federal or state law." Fla. Stat. § 501.212(1). The safe harbor does not exist merely because state or federal law does not **prohibit** an act or practice. *Dep't of Legal Affairs v. Father & Son Moving & Storage, Inc.*, 643 So. 2d 22, 24 (Fla. 4th DCA 1994). A defendant must establish the safe harbor's applicability. *Marty v. Anheuser-Busch Cos., LLC*, 43 F. Supp. 3d 1333, 1344 (S.D. Fla. 2014). Whether the safe harbor applies may be decided as a matter of law. *See, e.g., Prohias v. AstraZeneca Pharms., L.P.*, 958 So. 2d 1054, 1056 (Fla. 3d DCA 2007); *Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228, 1234 (S.D. Fla. 2007).

To augment public enforcement,[10] FDUTPA creates a private cause of action for "anyone aggrieved by a violation" to "obtain a declaratory judgment that an act or practice violates [FDUTPA] and to enjoin a person who has violated, is violating, or is otherwise likely to violate [FDUTPA]." Fla. Stat. § 501.211(1). A claim for declaratory and injunctive relief has two elements: (1) the defendant engaged in a deceptive or unfair act or practice; and (2) the plaintiff is "aggrieved" by the act or practice. *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*,

---

[10]To publicly enforce FDUTPA, Florida's Office of the State Attorney or Department of Legal Affairs may seek injunctive relief, actual damages, and cease-and-desist orders on behalf of consumers. *S.D.S. Autos, Inc. v. Chrzanowski*, 976 So. 2d 600, 609 (Fla. 1st DCA 2007).

No. 4D13-3916, 2015 WL 3480114, at *2 (Fla. 4th DCA June 3, 2015) (to be published). "The statute is clear on its face. It merely requires an allegation that the consumer is in a position to complain (that he or she is aggrieved by the alleged violation) and that the violation has occurred, is now occurring, or is likely to occur in the future." *Davis v. Powertel, Inc.*, 776 So. 2d 971, 975 (Fla. 1st DCA 2000).

"In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may [also] recover actual damages, plus attorney's fees and court costs." Fla. Stat. § 501.211(2). Actual damages are "'the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Rodriguez v. Recovery Performance & Marine, LLC*, 38 So. 3d 178, 180 (Fla. 3d DCA 2010). Actual damages do not include nominal damages, speculative losses, or compensation for feelings of disappointment. *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006). A claim for damages has three elements: (1) a deceptive or unfair act or practice, (2) causation, and (3) actual damages. *Id.* Reliance by the plaintiff is not an element because the question "is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances." *Davis*, 776 So. 2d at 974.

An aggrieved person may obtain declaratory and injunctive relief even if he cannot obtain actual damages. *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012). FDUTPA "is broadly worded to

authorize declaratory and injunctive relief even if those remedies might not benefit the individual consumers who filed the suit. … [It] is designed to protect not only the rights of litigants, but also the rights of the consuming public at large." *Davis*, 776 So. 2d at 975.

A FDUTPA claim is subject to a four-year statute of limitations. *Brown v. Nationscredit Fin. Servs. Corp.*, 32 So. 3d 661, 662 n.1 (Fla. 1st DCA 2010). A claim generally accrues for statute-of-limitations purposes when the last element occurs. Fla. Stat. § 95.031. A FDUTPA claim usually accrues on the purchase date, but not always. *Compare Point Blank Solutions v. Toyobo Am., Inc.*, No. 09-61166-CIV, 2011 WL 2214357, at *2 (S.D. Fla. June 7, 2011) (unpublished) (purchase date) *with Saavedra v. Albin Mfg. Corp.*, No. 8:11-cv-1893-T-33TBM, 2012 WL 254122, at *3–4 (M.D. Fla. Jan. 27, 2012) (unpublished) (not necessarily purchase date).

## V.    Standards

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief may be granted." In a case filed as a class action, a court may rule on a Rule 12(b)(6) motion to dismiss before deciding class certification. *Tapken v. Brown*, No. 90-691-CIV-MARCUS, 1992 WL 178984, at *12 (S.D. Fla., Mar. 13, 1992) (unpublished).

To decide a Rule 12(b)(6) motion to dismiss, a court may consider only the factual allegations in the complaint, anything attached to the complaint, anything extrinsic to the complaint that is central to the claim and without challenge to its

authenticity, and any judicially noticeable facts.[11] *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015). The court must accept as true factual allegations and construe them in the light most favorable to the non-movant. *Fuller v. SunTrust Banks, Inc.*, 744 F.3d 685, 687 n.1 (11th Cir. 2014). The court need not accept as true internally inconsistent factual allegations or unwarranted deductions. *Response Oncology, Inc. v. Metrahealth Ins. Co.*, 978 F. Supp. 1052, 1058 (S.D. Fla. 1997).

Federal Rule of Civil Procedure 8 requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). While allegations need not satisfy any "technical form," Rule 8 requires them to be "simple, concise, and direct." Fed. R. Civ. P. 8(e)(1). Rule 8 does not require "'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). If allegations are just "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," the claim will not survive a Rule 12(b)(6) motion to dismiss. *Twombly*, 550 U.S. at 555. To survive, the allegations "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 570). A claim is facially plausible if the

---

[11]Under that standard, the Court may consider the data posting attached to the original complaint, Doc. 1-1 at 56–58, and the motion to dismiss, Doc. 76-1 at 4–6, because it is central to the claim and without challenge to its authenticity, though doing so is unnecessary because the allegations in the amended complaint summarize the data posting.

factual allegations permit the court to reasonably infer that the alleged misconduct was unlawful. *Id.* Factual allegations that are "'merely consistent with' a defendant's liability," however, are not facially plausible. *Id.* (*quoting Twombly*, 550 U.S. at 557).

If fraud is alleged, Rule 8 is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b). *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1051 (11th Cir. 2015). In recognition that a fraud allegation can be easily fabricated, *Bennett v. MIS Corp.*, 607 F.3d 1076, 1101 (6th Cir. 2010), and carries "potential stigmatic injury," *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 949 (7th Cir. 2013), including great harm to a business's reputation, *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007), Rule 9(b) requires a plaintiff "alleging fraud," to "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), forcing "the plaintiff to do more than the usual investigation" before alleging fraud. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014).

Rule 9(b) serves many purposes. It ensures a fraud allegation is "responsible and supported, rather than defamatory and extortionate." *Borsellino*, 477 F.3d at 507. It discourages a "sue first, ask questions later" approach. *Cincinnati Life*, 722 F.3d at 949. It alerts the defendant to "the precise misconduct with which [it is] charged." *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012). And it narrows potentially wide-ranging discovery to relevant matters. *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011).

"While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth (1) precisely what statements or omissions were

made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them;[12] (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). Allegations generally must be made on more than mere information and belief, though that requirement may be relaxed if the information is only within the defendant's knowledge or control and the plaintiff sufficiently states the reasons for the belief. *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 & 1314 n.25 (11th Cir. 2002); *Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003) (unpublished); *see, e.g., United States ex rel. Walker v. R&F Properties of Lake Cnty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (Rule 9(b) satisfied by nurse's belief that employer submitted false claims based on personal discussions with office administrator; distinguishable from cases involving outsider making speculative allegations that fraudulent claims must have been made or plaintiff failing to explain basis for belief). Failure to satisfy Rule 9(b) is a ground for dismissal. *FindWhat*, 658 F.3d at 1296.

For its arguments, Florida Coastal applies Rule 9(b)'s heightened pleading standard. Doc. 76 at 9–10. The plaintiffs respond the standard does not apply in

---

[12]If a corporation may be liable, specifying those within the corporation who allegedly perpetrated fraud is pertinent to the particularity requirement but not mandatory. *United States ex rel. Health v. AT&T, Inc.*, No. 14-7094, 2015 WL 3852180, at *11 (D.C. Cir. June 23, 2015) (to be published); *United States ex rel. Bledsoe v. Cnty. Health Sys., Inc.*, 501 F.3d 493, 506 (6th Cir. 2007).

FDUTPA cases but they satisfied it regardless. Doc. 83 at 8.

The Eleventh Circuit has not discussed Rule 9(b) in a case raising a FDUTPA claim. It has held that Rule 9(b) extends beyond common-law fraud allegations to statutory fraud allegations. *Urquilla-Diaz*, 780 F.3d at 1052 (False Claims Act, 31 U.S.C. §§ 3729−33); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1292 (11th Cir. 2010) (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961−68, if based on racketeering pattern consisting entirely of predicate acts of fraud); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (§ 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)). It has also held that Rule 9(b) extends to fraud allegations even when the elements of the claim asserted do not perfectly overlap with the elements of common-law fraud. *Clausen*, 290 F.3d at 1309. And recently, it held that Rule 9(b) extends to allegations of negligent misrepresentation under Florida law because that tort "sounds" in fraud. *Lamm v. State St. Bank & Trust*, 749 F.3d 938, 950 (11th Cir. 2014).

Addressing Rule 9(b) in a case raising a claim under another state consumer-protection law, the Seventh Circuit held Rule 9(b) does not apply to allegations of an unfair act or practice, *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008), but applies to allegations of a fraudulent act or practice, *Camasta*, 761 F.3d at 736−37. The Seventh Circuit reasoned that because Rule 9(b) applies to allegations of fraud—not claims of fraud— it applies if a claim "sounds" in fraud; "in other words, if it is premised on a course of fraudulent conduct." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v.*

*Walgreen Co.*, 631 F.3d 436, 446−47 (7th Cir. 2011).

The Ninth Circuit takes that approach, *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124−25 (9th Cir. 2009), this Court has recently recognized that approach as the "emerging trend" among federal courts in cases raising FDUTPA claims, *Total Containment Solutions, Inc. v. Glacier Energy Servs., Inc.*, No. 2:15-cv-63-FtM-38CM, 2015 WL 3562622, at *2 (M.D. Fla. June 5, 2015) (unpublished), and that approach accords with the language of Rule 9(b) (its use of "alleging" rather than "claiming"), the purposes of Rule 9(b) (including to protect against unsubstantiated fraud allegations), and the Eleventh Circuit's recent holding that Rule 9(b) applies to allegations sounding in fraud (*see Lamm*, 749 F.3d at 950). That a FDUTPA claim does not require reliance does not matter because perfect overlap with common-law fraud is not dispositive. *See Clausen*, 290 F.3d at 1309 (quoted).

I recommend that approach as well reasoned here. Under that approach, whether Rule 9(b)'s heightened pleading standard applies depends not on the mere fact that the plaintiffs raise FDUTPA claims but on whether the plaintiff's allegations sound in fraud. *See Lamm*, 749 F.3d at 950. Fraud "is not limited to misrepresentations and misleading omissions"; it is "a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain advantage over another by false suggestions or by the suppression of truth." *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000).

With the peppering of fraud allegations throughout the amended complaint, the plaintiff's FDUTPA claims sound in fraud. *See* Doc. 74 ¶ 55 (Florida Coastal's

"actions constitute unlawful, unfair, deceptive **and fraudulent** practices"); Doc. 74 ¶ 58 ("As part of its **fraudulent** marketing practices and recruitment program, Florida Coastal engaged in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and **fraudulently** induce reliance by Plaintiffs and members of the Class"); Doc. 74 ¶ 23 (seeking an injunction enjoining Florida Coastal from engaging in unfair, unlawful, **or fraudulent** practices). *See Borsellino*, 477 F.3d at 507 ("[T]he … opening brief is riddled with references to fraud, showing that this theory pervades the entire case."). Because the FDUTPA claims sound in fraud, Rule 9(b) applies.

## VI. Motion and Response

For its safe-harbor argument, Florida Coastal observes the ABA is a "quasi-governmental agency" because, for student-assistance programs, the United States Department of Education has appointed the ABA as the national agency for law-school accreditation. Doc. 76 at 11−15. Florida Coastal contends by publishing aggregate figures, it and other law schools satisfied the ABA standard requiring reporting of consumer information, and the plaintiffs' only allegation that Florida Coastal failed to comply with the ABA standard is insufficiently specific to satisfy Rule 9(b)'s heightened pleading standard. Doc. 76 at 11−15. The plaintiffs respond that any safe-harbor defense should not be decided on a motion to dismiss, Florida Coastal has "conveniently ignored" the numerous allegations it failed to comply with the ABA standard, the safe harbor does not apply merely because no law expressly prohibit an act or practice, and Florida Coastal has not shown how any state or

federal law required or specifically permitted its acts. Doc. 83 at 4–7.

For its argument that the plaintiffs insufficiently allege a deceptive or unfair act or practice, Florida Coastal observes, for employment data, that the plaintiffs do not allege Florida Coastal ever claimed its figures represented only full-time, J.D. required or preferred positions and contends they do not allege facts specifying when, where, and how the figures were published. Doc. 76 at 15–16. It contends that, for salary data, the plaintiffs concede it disclosed the percentage of responding graduates for the 2009, 2010, and 2011 classes and otherwise allege only facts that should not be considered because they are based only on information and belief. Doc. 76 at 16–17. The plaintiffs respond their allegations sufficiently allege and amply apprise Florida Coastal of its deceptive and unfair acts, pointing to the following particular allegations:

   a) Stating false placement rates during the recruitment and retention process, including that approximately 80–95 percent of Florida Coastal graduates secured employment within nine months of graduation;

   b) Manipulating post-graduate employment data, so as to give the appearance that the overwhelming majority of recent graduates secured full-time, permanent employment for which a JD degree is required or preferred;

   c) Grossly inflating the reported mean/median salaries earned by recent graduates;

   d) Disseminating false post-graduate employment data and salary information to various third-party data clearinghouses and publications, such as the ABA and *US News*;

   e) Making deceptive and misleading statements, representations and omissions concerning the pace at which recent graduates could obtain gainful employment in their chosen field; and

f)   Causing students to pay inflated tuition based on materially misleading statements, representations and omissions, including, specifically, that approximately 80−95 percent of Florida Coastal graduates secure gainful employment.

Doc. 83 at 7−9 (quoting Doc. 74 ¶ 59).

For its argument that the plaintiffs insufficiently allege causation, Florida Coastal observes they allege no knowledge about its employment or salary data when they enrolled or stayed enrolled or how they would have proceeded differently. Doc. 76 at 17−18. It contends their allegations that the data was "material" to their decision to enroll and "proximately caused" them to pay inflated tuition are legal conclusions entitled to no consideration. Doc. 76 at 18. The plaintiffs respond they only need to sufficiently allege Florida Coastal's acts were "*a* cause," not "*the* cause," and they have done so with the allegation that they "enrolled at Florida Coastal for the purpose of securing upon graduation full-time, permanent employment for which a JD degree is required or preferred. [Florida Coastal's] acts, practices and omissions, therefore, were material to Plaintiffs' decision to enroll and attend Florida Coastal, and further proximately caused Plaintiffs … to pay inflated tuition." Doc. 83 at 9−10 (quoting Doc. 74 ¶ 59). The plaintiffs contend Florida Coastal improperly conflates causation with actual reliance, which is not required to state a FDUTPA claim.

For its argument that the plaintiffs insufficiently allege they suffered actual damages, Florida Coastal contends the only inference that can be drawn from the plaintiffs' allegations about their livelihoods is that it "provided [them] with a thorough legal education that prepared them to practice law—if they wished to do

so." Doc. 76 at 20. Florida Coastal contends they cannot proceed under a "price premium" approach (assessing actual damages based on a deceptive or unfair act or practice that allowed a vendor to charge a premium it would not have charged absent the deceptive or unfair act or practice) because any benchmark price against which to calculate the premium would be speculative (what the price of a Florida Coastal education would have been absent the published employment and salary data). Doc. 76 at 21–22. Florida Coastal observes the plaintiffs' allegations undercut their theory that its data caused students to pay inflated tuition because employment numbers allegedly fell while tuition numbers rose. Doc. 76 at 22. They respond the damages they seek—"a refund of the portion of their tuition inflated by [Florida Coastal's] misstatements (compared to a law school that did not make such misstatements) as well as other damages such as fees paid to [Florida Coastal], books, travel expenses and other pecuniary loss incidental to their purchase of a [Florida Coastal] degree"— are not speculative because they have been incurred and the Court is equipped to value degrees. Doc. 83 at 12–13. They emphasize a complaint need not plead a method for calculating damages. Doc. 83 at 14.

For its argument the statute of limitations bars most of the claims, Florida Coastal contends the amended complaint may add a "completely new group" of students (students who never graduated from Florida Coastal) and argues the amended complaint may not relate back to them. Doc. 76 at 23; *compare* Doc. 1-1 ¶ 85 (original complaint filed in February 2012 on behalf of all persons "who are either presently enrolled or graduated from Florida Coastal … within the statutory period")

*with* Doc. 74 ¶ 45 (amended complaint filed in November 2014 on behalf of all persons enrolled in Florida Coastal before August 2012). Florida Coastal contends for any of those new plaintiffs or proposed class members who enrolled before November 2010 (4 years before the amended complaint), the statute of limitations has run. Doc. 76 at 24–25. The plaintiffs respond claims between February 2008 and 2012 are within the statute of limitations, they attended Florida Coastal between 2008 and 2012, and the accrual dates, even assuming they are enrollment dates, are factual matters that should not be decided on a motion to dismiss.

## VII.  Analysis

Florida Coastal borrows its arguments from cases in which law schools succeeded at the dismissal stage. Those cases, and the cases in which law schools did not succeed then, have limited persuasive value as to most of the arguments because they did not involve the same factual allegations or state consumer-protection laws. In-depth analysis is unwarranted on all but one of Florida Coastal's arguments.

The safe-harbor provision does not apply because Florida Coastal has not shown any "federal or state law" that "required or specifically permitted" its alleged acts. *See* Fla. Stat. § 501.212(1) (quoted). The ABA is a private entity, its standards are not law, and its standards did not require or specifically permit Florida Coastal— at a minimum—to collect and publish salary data in the manner it allegedly did.[13]

---

[13]To participate in student assistance programs, a school must follow criteria, including providing prospective students "the placement in employment of, and types of employment obtained by, graduates of the institution's degree or certificate programs, gathered from such sources as alumni surveys, student satisfaction surveys, … or other relevant sources." 20 U.S.C. § 1092(a)(1)(R). If a school

Any failure to sufficiently allege causation or damages is not a basis for the action

Florida Coastal requests—dismissal of the amended complaint "in its entirety, and

---

"advertises job placement rates as a means of attracting students," the school must provide "the most recent available data concerning employment statistics … and any other information necessary to substantiate the truthfulness of the advertisements," 20 U.S.C. § 1094(a)(8), including information about "the placement of, and types of employment obtained by, graduates of the institution's degree or certificate programs," 34 C.F.R. § 668.41(d)(5).

The Secretary of the Department of Education recognizes national accrediting agencies that develop standards and determine if the standards are met, including, for law schools, the ABA. 20 U.S.C. §§ 1099b, 1221e-3. Federal agencies "do not accredit schools; instead they accredit accrediting agencies, which apply standards of their own devising but satisfactory to the national government." *Chicago Sch. of Automatic Trans., Inc. v. Accreditation Alliance of Career Schs. & Colleges*, 44 F.3d 447, 448 (7th Cir. 1994). Although accrediting agencies serve an "important quasi-public role … they are also private entities." *Prof' Massage Training Ctr., Inc. v. Accreditation Alliance of Career Schs. & Colleges*, 781 F.3d 161, 171 (4th Cir. 2015). The Secretary may not establish criteria that would interfere with an accrediting agency's standards for assessing an institution's success with respect to student achievement, including job placement rates. 20 U.S.C. § 1099b(a)(5)(A) & (g).

The Administrative Procedure Act, 5 U.S.C. §§ 551–559, applies to federal agencies but not accrediting agencies, though courts have applied administrative law principles in evaluating their decisions. *Prof' Massage*, 781 F.3d at 170. Rules that go through the notice-and-comment process have "the force and effect of law"; interpretative rules that do not "are not accorded that weight in the adjudicatory process." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203–04 (2015).

Florida Coastal asserts, "Other courts considering consumer fraud claims against law schools have found that the ABA's regulations fall under similar statutory safe harbors." Doc. 76 at 12 n.5. The only case Florida Coastal cites— *Phillips v. DePaul Univ.*, No. 12CH3523, 2012 WL 40000001 (Ill. Cir. Ct. Sept. 11, 2012) (unpublished)—is inapposite because it analyzed the very different safe-harbor provision of the Illinois Consumer Fraud Act. *Compare* Fla. Stat. § 501.212(1) (exempting from FDUTPA liability any "act or practice required or specifically permitted by federal or state law"), *with* 805 ILCS 505/10b(1) (exempting from Illinois Consumer Fraud Act liability for conduct "specifically authorized by any regulatory body or office acting under statutory authority of this State or the United States"). If anything, that case hurts Florida Coastal's argument; had the Florida legislature wanted a broader safe-harbor provision, it could have used that language. *See Gomez-Jimenez*, 943 N.Y.S.2d at 842 ("If the state legislature had intended to include associations as interpreting bodies it could easily have done so, and did not").

with prejudice," Doc. 76 at 1, 25. Although whether Florida Coastal's alleged acts caused the plaintiffs actual damages is debatable, neither causation nor actual damages must be alleged for other relief they request: enjoining Florida Coastal from engaging in unfair, unlawful, or fraudulent practices, Doc. 74 at 23–24. *See Caribbean Cruise*, 2015 WL 3480114, at *2; *Wyndham,* 123 So. 3d at 1152.[14] Florida Coastal has not contended they have insufficiently alleged the "aggrieved" element for injunctive relief as a basis for the all-encompassing action it requests. *See generally* Doc. 76. Likewise any possible running of the statute of limitations as to some plaintiffs; Florida Coastal concedes the defense does not apply to all plaintiffs and all claims, *see* Doc. 76 at 23 ("The relevant statute of limitations bars most of the named plaintiffs' claims"), and assuming enrollment dates are accrual dates, no allegation or document the Court may consider at this stage includes those. That defense is best left for certification[15] or summary-judgment proceedings.[16]

---

[14]The plaintiffs do not assert neither causation nor damages must be alleged for the injunctive relief they request, instead just confronting head-on Florida Coastal's arguments concerning the elements for the actual damages they request. They nevertheless have not affirmatively indicated any intent to abandon the injunctive relief they request.

[15]"Courts commonly certify classes with start dates that are linked to the statute of limitations periods." *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 650 n.3 (S.D. Fla. 2012). When an action occurred for purposes of determining the accrual date is a question of fact. *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999).

[16]A statute-of-limitations bar is an affirmative defense, Fed. R. Civ. P. 8(c), and "plaintiffs are not required to negate an affirmative defense in their complaint," *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (alterations omitted). A Rule 12(b)(6) dismissal on statute-of-limitations grounds is inappropriate unless it is "apparent from the face of the complaint that the claim is time-barred." *Id.* (internal quotation marks omitted).

That leaves the Court with Florida Coastal's strongest argument for dismissal of the entire case with prejudice: the plaintiffs do not allege a plausible deceptive or unfair act or practice actionable under FDUTPA; in other words, an act or practice that "is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment," *Beach*, 139 So. 3d at 387, or an act or practice that causes substantial consumer injury that the consumers could not have reasonably avoided (and no outweighing countervailing interests), *Porsche*, 140 So. 3d at 1096.

Two recent cases against other law schools provide contrasting ways of viewing the argument: *Gomez-Jimenez*, 943 N.Y.S.2d 834, and *Harnish*, 931 F. Supp. 2d 641. In *Gomez-Jimenez*, the court held that similar factual allegations stated no claim under state law prohibiting an act or practice that is deceptive or misleading in a material way to a reasonable consumer. 943 N.Y.S. 2d at 843−47. The court deemed college graduates considering law school "a sophisticated subset of education consumers, capable of sifting through data and weighing alternatives before making a decision regarding their post-college options." *Id.* at 843. The court found they had "any number of sources of information to review when making their decisions," including NALP reports and studies (which the plaintiffs here and there referenced in the complaint) and *U.S. News* publications (of which the court took judicial notice) indicating modest employment rates. *Id.* at 843−44. Regarding salary data alleged to be misleading because it was based on a "'deliberately selected' small sample of graduates," the court observed "the relatively small percentage of students was disclosed whenever the salary data included the average salary statistic," the law

school cautioned the highest reported salary was atypical for most graduates, and there was no statement that the salaries represented the salaries earned by all graduates. *Id.* at 845. The court emphasized, "In researching law school options, it also should have come as no surprise to these law school consumers that the most lucrative law jobs often are associated with having attended a high ranking school. … [A] reasonable consumer who is seriously considering [the law school] is more likely to appreciate the nexus between high law school rankings and commensurate employment and earning expectations." *Id.* "It is difficult for the court to conceive," it continued, "that somehow lost on these plaintiffs is the fact that a goodly number of law school graduates toil (perhaps part time) in drudgery or have less than hugely successful careers. [The] applicants, as reasonable consumers of a legal education, would have to be wearing blinders not to be aware of these well-established facts of life in the world of legal employment." *Id.* Noting the law school's website published that the course of study for a J.D. prepares students to practice law but is also ideal for other professions, the court opined that the plaintiffs had "selectively relied only on the relatively incomplete statistics … and mischaracterized them in their entirety as a deceptive enticement that makes it appear all jobs reported are full-time law jobs for which a law degree is required or preferred." *Id.* at 846. The court concluded that, "[g]iven the impact of the 2008 Great Recession on the legal job market as described in the plaintiffs' complaint, … [the] statements could not have been materially misleading to a reasonable consumer acting reasonably under the circumstances, i.e. taking into account the obvious, dramatic changes in the economy as they began to

impact the legal profession." *Id.; accord MacDonald v. Thomas M. Cooley Law Sch.*, 880 F. Supp. 2d 785, 794 (W.D. Mich. 2012) ("[B]asic deductive reasoning … informs a reasonable person that the employment statistic includes all employed graduates, not just those who obtained or started full-time legal positions."), *aff'd on other gds.* 724 F.3d 654.

In *Harnish*, the court held that similar factual allegations stated a claim under state law prohibiting an affirmative act or practice that is misleading and outside the norm of reasonable business practice in that it will victimize the average consumer or an omission that knowingly conceals a material fact with the intent that the plaintiff will rely on the concealment. 931 F.Supp.2d at 648−52. Observing the law school placed the data above, "Full Time Legal Employers," the court rhetorically asked, "Why should a reasonable student looking to go to law school consider that data to include non law-related and part-time employment? Should that student think going to [the law school] would open employment as a public school teacher, full or part-time, or an administrative assistant, or a sales clerk, or a medical assistant?" *Id.* at 649−50. The court added the study of law is the learning of a profession, the law school sought to persuade a prospective law student to attend to receive a J.D., and the information was disseminated to third-party evaluators to establish the law school's standing among law schools. *Id.* at 650. "Within this context," the court concluded, "it is not implausible that a prospective law student making the choice of whether or which law school to attend, would believe that the employment rate referred to law related employment." *Id.* The court disagreed that basic deductive

reasoning would inform a reasonable person that the statistics included all types of jobs. *Id.* Emphasizing the law is intended to promote the disclosure of relevant information to enable the consumer to make intelligent decisions, the court concluded, "an employment rate upwards of 90 percent plausibly gave false assurance to prospective students regarding their legal employment opportunities upon investment in and attainment of [the law school's] degree. While the thread of plausibility may be slight, it is still a thread." *Id.* at 651.

Here, setting aside the allegations are made only on information and belief (for the moment) and omitting legal conclusions, internal inconsistencies, and unwarranted inferences, the well-pleaded factual allegations can be summarized as follows. Florida Coastal published on its website and through outside sources employment and salary data obtained from responses to surveys sent to all recent graduates. Doc. 74 ¶ 28. Its website touted a career staff that would both guide a student along his "own unique career path" and facilitate his transition from law school to legal practice. Doc. 74 ¶ 27. For the 2004 to 2009 classes, it published rates of employment within nine months of graduation of 88 percent and higher. Doc. 74 ¶ 28, 29. For the class of 2010, it published a rate of employment within nine months of graduation of 80 percent, breaking down that percentage by private practice, business, government, public interest, judicial clerkships, academia, seeking employment, unemployed and not seeking employment, and unknown. Doc. 74 ¶¶ 5, 30. It added that 82 percent of those employed had jobs for which a J.D. was required or preferred. Doc. 74 ¶ 30. Like most or all law schools before August 2012, it included

34

in the data part-time, non-legal, temporary, voluntary, school-funded, and solo-practitioner jobs without saying so. Doc. 74 ¶¶ 26, 28, 37, 38. The percentages would have been much lower if it had not included those jobs. Doc. 74 ¶¶ 31, 41. It also included anyone employed at any point in the nine months even if no longer employed as of the reporting date. Doc. 74 ¶ 37. For the class of 2010, it published the average starting salary as $48,615, with 29 percent of employed graduates sharing their salary, and the average salary for all graduates in private practice as $51,981. Doc. 74 ¶¶ 30, 41. It did not disclose the percentages of graduates for each job category who reported salaries. Doc. 74 ¶ 41. It calculated the average salary based only on those who submitted their salaries, which, from the numbers, appeared to be mostly the private practitioners.[17] Doc. 74 ¶ 3.

All of those allegations are based on information and belief, with counsel explaining the bases for that information and belief ("including but not limited to reviews of advertising and marketing material, various publicly available

---

[17]The plaintiffs allege the more troubling fact that Florida Coastal "chose a few graduates in high-paying jobs to respond to its job survey while ignoring all other graduates." Doc. 74 ¶ 40. The Court should not consider that allegation because it conflicts with the allegations that Florida Coastal obtained the employment and salary data it publicizes from surveys it sends to all recent graduates, Doc. 74 ¶ 28, and "calculated the [percentages] based on a small, deliberately selected subset of compensated graduates who reported their salary information," Doc. 74 ¶ 40; *see also* Doc. 74 ¶ 3. *See Response*, 978 F. Supp. at 1058 (court deciding motion to dismiss need not accept as true internally inconsistent factual allegations or unwarranted deductions). The Court also should not consider the allegations, "Upon information and belief, for all … employment reports published before July 2011, Florida Coastal failed to disclose the overall percentage of graduates who reported salary information," Doc. 74 ¶ 41, and "few Florida Coastal graduates earned anything near the reported mean/median salaries," Doc. 74 ¶ 36, because they lack specifics that would make them meaningful, including the average salaries provided before July 2011.

information and interviews of former students," Doc. 74 at 1). Because Rule 9(b) applies and the plaintiffs have not shown the information is only within Florida Coastal's knowledge and control, the Court should not consider those allegations. *See Clausen*, 290 F.3d at 1311 & 1314 n.25. Regardless, they fail to state a plausible deceptive or unfair act or practice as a matter of law.

In recommending that conclusion, I am persuaded by *Gomez-Jimenez*. FDUTPA does not require companies to be wholly transparent or prohibit them from publishing facts in the light most conducive to business, as long as the publication is not probably deceptive and likely to cause injury to a reasonably relying consumer, *Zlotnick*, 480 F.3d at 1284, or resulting in substantial injury to consumers that they could not reasonably avoid and not outweighed by countervailing policies, *Porsche*, 140 So. 3d at 1096. A person considering law school, while not necessarily sophisticated, is college-educated and may be reasonably expected to perform some due diligence that goes beyond glancing at a for-profit enterprise's self-serving numbers before plunging into substantial debt. *See* Doc. 74 ¶ 25 (allegation that almost all Florida Coastal students take out loans and graduate with significant debt, recently averaging $120,000 to $150,000). As the court in *Gomez-Jimenez* observed, it was and remains common knowledge that law-school rankings correlate with legal-job prospects, law graduates do not necessarily work as lawyers, and the downturn in the economy meant fewer jobs no matter the kind. Beyond that common knowledge, there were, as that court further observed, numerous sources of information available to prospective law students indicating modest employment rates. *Id.* at 843−44. The

plaintiffs do not allege that Florida Coastal ever affirmatively and wrongfully stated that the employment rate was based on a limited subset of lucrative jobs. *See generally* Doc. 74. For a prospective student to have read the data Florida Coastal published to include only full-time, permanent, non-solo-practitioner, non-school-created, amply paid jobs for which a J.D. is required or preferred would have been for that student to believe there was an almost unlimited supply of those jobs for nearly all graduates of a law school "placing in the bottom 5 percent of accredited law schools based on grade point averages and LSAT scores," Doc. 74 ¶¶ 21–22, including during times of economic instability. That would have been unreasonable, and that would have been reasonably avoidable.

Unlike in *Harnish*, there is no allegation that Florida Coastal published the data alongside, "Full Time Legal Employers," or another misleading heading. And unlike in *Harnish*, the question under FDUTPA is not whether the employment and salary data "plausibly gave false assurance to prospective students," *Harnish*, 931 F. Supp. 2d 641 (quoted), but whether the plaintiffs have stated a plausible claim that publishing the employment and salary data in the manner alleged would result in probable deception to a reasonably relying consumer, *Zlotnick*, 480 F.3d at 1284, or substantial injury that could not have been reasonably avoided, *Porsche*, 140 So. 3d at 1096). Although the website touted staffers who would facilitate a student's transition from law school to legal practice, Doc. 74 ¶ 27, suggesting the employment and salary data included only law-related jobs, it also touted staffers who would help guide a student along his "own unique career path," Doc. 74 ¶ 27, suggesting the

employment and salary data included a variety of things a student could do with his J.D. Although the employment data encompassing all jobs was above the salary data indicating an average salary higher than what a part-time, temporary, or non-legal jobs would pay, the website provided information about a variety of jobs and specified the salary data was based on responses supplied by only 29 percent of the employed graduates. Doc. 74 ¶ 30; *see also* Doc. 1-1 at 56−58. A reasonable consumer would not draw from that small sampling that it reflected the average salary of all employed graduates or that nearly all employed graduates were in working in a full-time, permanent job for which a J.D. was required or preferred. *See Bevelacqua*, 39 Misc. 3d 1216(A) at *9 ("Reasonable college graduates would quickly conclude [from disclosure that salary information was from only 40 percent of graduates] that the reported information was not a statistically meaningful measure of the salary experience of all graduates for that year.").

In short, Florida Coastal raises one argument that warrants the action requested: the plaintiffs fail to allege facts that state a plausible deceptive or unfair act or practice under FDUTPA, and therefore fail to state a FDUTPA claim upon which relief may be granted. That failure warrants dismissal of the case with prejudice.

## VIII. Recommendation

I recommend **granting** the motion to dismiss, Doc. 76; **dismissing** the case with prejudice, Doc. 74; and **directing** the clerk to enter judgment in favor of Florida Coastal School of Law, Inc., and close the case.[18]

**Entered** in Jacksonville, Florida, on August 11, 2015.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:      Counsel of Record

---

[18]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.